**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **MECCO, INC.,** | * |
|           **Plaintiff** | |
| | * |
|           **v.** | **CIVIL ACTION NO. PWG-05-540** |
| | * |
| **CAPITAL HARDWARE SUPPLY,** | |
| **INC., et al.** | * |
| | |
|           **Defendants** | * |

**MEMORANDUM OPINION**

This interpleader action was tried before me without a jury by the consent of the parties. (Paper Nos. 50-51). The case arises out of multiple claims to funds owed by mechanical contractor Mecco, Inc. to a sheet metal subcontractor known as "MetalMax"[1] for heating, ventilation and air conditioning work performed on various commercial construction projects. MetalMax was owned and operated by Clifford A. "Tony" Clarkson, who also owned and operated a company known as CAC Balancing, Inc. The only two interpleader defendants remaining in this case are Colombo Bank, FSB, a secured creditor of CAC Balancing, Inc., and the United States Internal Revenue Service,[2] which holds tax liens against both CAC Balancing, Inc. and Tony Clarkson as an individual. At the conclusion of the trial in this case, I ruled from the bench that Colombo Bank was entitled to the interpleader funds at issue, but indicated that I would issue a written opinion explaining my decision. This memorandum opinion provides that

---

[1] MetalMax was not a formally organized business.

[2] The initial interpleader defendants included Capital Hardware Supply, Inc., the Maryland Comptroller of the Treasury, CAC Balancing, Inc., Clifford Clarkson t/a MetalMax Sheetmetal Works, Sheet Metal Workers Union, Local 100, and Turboduct, Inc. *See* Compl. The Maryland Comproller of the Treasury, CAC, and Clarkson did not answer the complaint, the remaining defendants have been dismissed throughout the course of the litigation.

explanation.

**I.     Background**

    **A.     CAC and MetalMax**

Clarkson incorporated CAC Balancing, Inc. ("CAC") in 1996. (Tr. 20).[3] He was the sole shareholder, officer and director of the company, which performed air and water balancing for commercial HVAC systems. (Tr. 20, 61-62). Sometime around the year 2000 Clarkson decided to expand into sheet metal installation, and began performing sheet metal and duct work under the name "MetalMax." (Tr. 21). He wrote checks, signed contracts, and issued invoices under that name. (IRS Exs. 5-7). Clarkson testified that he chose the name MetalMax because wanted his sheet metal division to operate under a name that customers would associate with sheet metal, rather than balancing work. (Tr. 21). Both Clarkson and Mecco owner William Bradley also testified that it is common practice for mechanical contractors to perform sheet metal work and balancing work under separate names because many project engineers and architects will not hire the same company to balance an HVAC system that it has installed. (Tr. 21, 73-74). To do so, as Mr. Bradley described it, would be "like the fox guarding the henhouse." (Tr. 74).[4]

Clarkson testified that he considered CAC and MetalMax to be one and the same, and that he held himself out as president of both. The names of both CAC and MetalMax were listed on Clarkson's Maryland and Virginia business licenses. Although CAC and MetalMax had separate phone lines, both were operated out of the same location in College Park, Maryland and

---

[3]All transcript citations are to the hearing transcript from the March 19, 2007 bench trial. Paper No. 99.

[4]It is not clear from either witness's testimony that operating under a different name would resolve this conflict of interest.

the same employee answered both lines. (Tr. 66) Clarkson handled all of the billing and kept track of the receivables for both CAC and MetalMax. He kept only one set of books for both, in which he treated the accounts receivable of MetalMax as belonging to CAC. (Tr. 27). The bank introduced into evidence an accounts receivable report generated by Clarkson on October 9, 2003 using the QuickBooks computer program. (hereinafter "the QuickBooks report"). On the QuickBooks report, work performed by CAC was identified by the term "air & water," while MetalMax work was designated as "sheetmetal." (Tr. 36. Colombo Ex. 6). In addition, although CAC and MetalMax had separate bank accounts, both were set up under CAC's federal tax identification number. (Tr. 24). Clarkson endorsed all checks for deposit in these accounts with a stamp bearing CAC's name and this single tax identification number. (Tr. 54).

Clarkson testified that only CAC issued IRS Form W-2's to employees of both CAC and MetalMax. (Tr. 25). Accordingly, he filed only one set of federal and state tax income tax returns for both CAC and MetalMax under the name of CAC. (Tr. 27). Significantly, the federal tax liens at issue in this interpleader action are the result of unpaid income tax withholding, Social Security, and federal unemployment taxes attributable to both CAC and MetalMax employees. (Tr. 28 - 29)

Although CAC and MetalMax each entered into a separate collective bargaining agreement with the Sheet Metal Workers International Union, Clarkson testified that he entered into the separate agreement for MetalMax at the union's request. (Tr. 56-57). Although there were two union contracts, Clarkson made all required contributions to the union benefit fund and submitted all corresponding reports under the name CAC. (Tr. 57). Likewise, when working on projects subject to the federal prevailing wage law, Clarkson submitted only one set of certified

weekly payroll reports in the name "CAC Balancing, Inc. / MetalMax Sheet Metal Works. (Tr. 51-52).

Finally, CAC filed a lawsuit against Mecco in Virginia state court in January 2004 alleging breach of contract and quantum meruit. (Tr. 58-59, Colombo Ex. 12). The lawsuit was brought on behalf of "CAC Balancing, Inc., t/a MetalMax." (Id.)

On July 14, 2000, Colombo Bank loaned CAC $250,000 secured by a promissory note and security agreement that attached to all of "all inventory, chattel paper, accounts, equipment, and general intangibles." (Colombo Exs. 1, 3). Colombo advanced CAC an additional $70,883.84 secured by a second promissory note and security agreement on August 31, 2000. (Colombo Ex. 2). The bank perfected its security interest in the aforementioned collateral by filing a financing statement with the Maryland State Department of Assessments and Taxation ("SDAT") on August 15, 2000.[5] (Colombo Ex. 4).

In March 2003 the IRS filed a tax lien for unpaid employee withholding in the amount of $330,726.71 against CAC in the Circuit Court for Anne Arundel County, Maryland. (IRS Ex. 1). The IRS filed another lien against CAC for $97,404.72 in November of that year. (IRS Ex. 2). In July 2005, the IRS filed tax liens against Clarkson as an individual in both the Circuit Court for Howard County and Prince George's County, Maryland in the amount of $319,568.37. (IRS Ex. 4).

On October 7, 2002, CAC forfeited its corporate charter to operate in the State of Maryland. (IRS Ex. 12). Shortly thereafter, in early 2003, CAC and MetalMax ceased

---

[5]The bank filed a continuation of its financing statement on March 28, 2006. (Colombo Ex. 4). This filing was timely under Md. Code Ann. COMM. LAW § 9-705.

operations. (Tr. 51). CAC defaulted on the loans and it is undisputed that, at the time of trial, CAC owed the bank a balance of $184,648.93, exclusive of interest, attorneys' fees and costs. On August 10, 2004, CAC entered into a settlement agreement with the bank that expressly authorized Colombo to, among other things, collect any sums owed to CAC by its account debtors. (Colombo Ex. 11).

### B.     Mecco, Inc.

Mecco is a mechanical contractor that subcontracted both commercial HVAC installation and balancing work to MetalMax and CAC, respectively. (Tr. 31). These jobs included "1722 Eye Street," "B&O Railroad," "F.O.B. #2" and "Kilpatrick Stockton." (Tr. 39, Colombo Ex. 6). The QuickBooks report indicates that the work performed for Mecco was "sheetmetal" work, and that CAC's outstanding accounts receivable for these jobs totaled $251.489.90. *Id.* In addition, the report indicates on what date Mecco was billed for each job performed and on what date the account receivable was due to be paid. *Id.* Clarkson testified that all work reflected on an invoice was complete by the date that the invoice was generated. (Tr. 41-42). The QuickBooks report therefore indicates that CAC and/or MetalMax performed $238,354.90 worth of work for Mecco before its charter was forfeited, and $13,135.00 after the October 7, 2002 forfeiture date. (Colombo Ex. 6). In any event, Clarkson testified that all work for Mecco was completed by December 11, 2002. (Tr. 40).

When Mecco became aware of the competing interests in these funds it filed the instant interpleader action under Md. Rule 2-221.[6] (*See* Compl.). In the complaint, however, Mecco claimed that it owed only $80,694 to MetalMax, and asserted that it had paid all funds due and

---

[6]The IRS subsequently removed the case to federal court. (Paper No. 1).

owing to CAC. (Compl. ¶ 12-13).

Colombo, asserting its rights as both an assignee under the settlement agreement and a secured creditor of CAC's accounts receivable under Md. Code Ann. COMM. LAW § 9-607,[7] filed a counterclaim against Mecco for breach of contract, alleging that "Mecco is indebted to CAC for labor and materials in an amount in excess of $80,694.00." (Counterclaim ¶9). That counterclaim subsequently was settled and Mecco was dismissed from the case on March 19, 2007. (Paper No. 92). Under that settlement agreement, Mecco paid an additional $76,806 in interpleader funds into the Court's registry for a total of $157,500. (*See* Paper No. 97)

**II.    Discussion**

This interpleader action presents several questions of law and one mixed issue of law and fact. Turning first to the mixed question of law and fact, the Court must determine the relationship between CAC and MetalMax and the affect that this relationship has on the priority of the competing security interests in this case. If they are a single entity, the parties agree that the bank's security interest has priority over the original $80,694 in interpleader funds to the extent that the work giving rise to those accounts receivable was performed before CAC forfeited its corporate charter. If not, the two are separate and the bank has no interest in the money due and owing from Mecco to MetalMax because its security interest is limited to CAC's

---

[7]§9-607 of the Uniform Commercial Code ("UCC"), as adopted by Maryland, provides that,
> [i]f so agreed, and in any event after default, a secured party: ... (3) may enforce the obligations of an account debtor or other person obligated on collateral and exercise the rights of the debtor with respect to the obligation of the account debtor or other person obligated on collateral to make payment or otherwise render performance ot the debtor, and with respect to any property that secures the obligations or of the account debtor or other person obligated on the collateral.

accounts receivable. In that case the IRS will prevail by virtue of its tax liens against Clarkson as an individual.  If CAC and MetalMax are found to be one entity, the next question of law involves what, if any, affect the forfeiture of CAC's corporate charter has on the bank's priority over accounts receivable arising out of work performed after the forfeiture date. Finally, the Court must determine who has priority over the additional $76,806 in interpleader funds resulting from the settlement of the bank's counterclaim against Mecco.  The IRS argues that, regardless of the bank's entitlement to the original interpleader funds, the tax liens have priority in the additional settlement funds, which it argues, did not come into existence, or become "choate," until the date of the settlement.

      A.      **The Priority of Federal Tax Liens**

Before I discuss the relationship between CAC and MetalMax, it is important to understand why this relationship is significant for the purpose of determining the priority of the competing liens at issue in this interpleader action. In this case, the Court must ultimately resolve a priority dispute between a perfected security interest and a federal tax lien, an undertaking that requires to Court to "enter ... the tortured meanderings of federal tax lien, intersected now by the somewhat smoother byway of the Uniform Commercial Code." *Texas Oil & Gas Corp. v. United States*, 466 F.2d 1040, 1043 (5th Cir. 1972).

An individual's failure to pay taxes results in a federal tax lien against "all property and rights to property, whether real or personal, belonging to such person."[8]  26 U.S.C. § 6321.  This

---

[8]The question of whether a taxpayer possesses "property" or "rights to property" to which a tax lien or other security interest can attach is governed by state law.  *Aquilino v. United States*, 363 U.S. 509, 512-513 (1960). Once the taxpayer's property interests are determined, however, federal law governs the priority of competing security interests in that property. *Id.* at 513.

federal tax lien is not valid against competing security interests until it is filed with the clerk of the district court in the jurisdiction where the property subject to the lien is located. 26 U.S.C. § 6322(f)(1)(B). "Federal tax liens do not automatically have priority over all other liens." *United States v. McDermott*, 507 U.S. at 449. "Absent provision to the contrary, priority for the purposes of federal law is governed by the common-law principle that 'the first in time is the first in right.'" *Id*. (citing *United States v. New Britain*, 347 U.S. 81, 85 (1954)). Accordingly, the priority of a lien created by state law, such as the security interest in accounts receivable held by Colombo, "depends on the time it attached to the property in question and became choate." *United States v. Pioneer American Ins. Co.*, 374 U.S. 84, 88 (1963)(internal quotation marks omitted). *See also United States v. Riverside Tenants Corp*., 886 F.2d 514, 518 (2d Cir. 1989). A lien is deemed to be perfected or "choate" for the purposes of determining priority under federal law when, (1) the identity of the lienor; (2) the property subject to the lien; and (3) the amount of the lien are all established. *McDermott,* 507 U.S. at 449. Thus, a federal tax lien will take priority over most other valid security interests in property that have not yet come into existence because, even if both interests attach at the same time, the federal lien is deemed first in time regardless of when competing security interests were otherwise perfected under state law. *Id*. at 453 (the filing of notice renders the federal tax lien extant for "first in time" priority purposes regardless of whether it has yet attached to identifiable property.)

The Federal Tax Lien Act, 26 U.S.C. § 6321 et. seq. ("FTLA"), provides a limited exception to this rule for certain secured commercial financing transactions. 26 U.S.C. § 6323(c). *See also McDermott*, 507 U.S. at 453-454 (observing that 26 U.S.C. §6323(c)(1) accords priority over filed federal tax liens to certain "commercial transactions financing agreements.") A state

created lien against collateral resulting from such an agreement therefore may be deemed "first in time" against a federal tax lien even though the underlying collateral technically has not yet come into existence. To fall within this statutory exception, the competing state law created lien must be (1) in qualified property; (2) covered by the terms of a written agreement that was entered into before the tax lien was filed; (3) constitute a "commercial transactions financing agreement;" and (4) superior, under local law, to any judgment lien arising out of an unsecured obligation. 26 U.S.C. § 6323(c); *Plymouth Savings Bank v. IRS*, 187 F.3d 203, 206 (1st Cir. 1999).

For the purposes of the FTLA, a commercial transactions financing agreement is one in which the secured party makes a loan to the taxpayer secured by "commercial financing security." Commercial financing security includes accounts receivable. *See* 26 U.S.C. § 6323(c)(2)(A) and (C). It is undisputed that the bank's security interest in CAC's accounts receivable is a qualified commercial financing transactions agreement for the purposes of the FTLA.

Under this statutory exception to the "first in time" preference accorded to federal tax liens, a preexisting security interest, such as that held by the bank, will be given priority over tax liens to the extent they are perfected prior to, or within 45 days after, the filing of a tax lien by the IRS. 26 U.S.C. §§ 6323(a); 6323(c)(1)(A) and (2)(A). Liens against accounts receivable are deemed to be perfected and to comply with the doctrine of choateness when the work giving rise to the account receivable is performed. *See, e.g.*, 29 C.F.R. § 301.6323(c)-1(d)("An account receivable ... is acquired by a taxpayer at the time, and to the extent, a right to payment is earned by performance."). *See also Bremen Bank & Trust Co. v. United States*, 131 F.3d 1259, 1264 (8th

Cir. 1997); *Texas Oil & Gas Corp. v. United States*, 466 F.2d 1040 (5th Cir. 1972); *Nat'l Communications Assoc., Inc. v. Nat'l Telecommunications Assoc., Inc*., 1995 WL 236731 (S.D.N.Y. 1995)("It is well established that a lien on accounts receivable becomes choate, and the receivables "exist" for the purposes of the Tax Lien Act, when the services giving rise to the accounts receivable are performed and payment becomes due.") Thus, a commercial financing transactions agreement creating a lien against accounts receivable will take priority over a federal tax lien if the work giving rise to the account receivable is performed before, or within 45 days after, the filing of notice of the federal tax lien, even if the money itself has not yet been paid.

The bank perfected its security interest in CAC's accounts receivable under Maryland law by filing a financing statement with SDAT in August 2000 and filing a continuation statement in March 2006. CAC/MetalMax performed all work under its contracts with Mecco on or before December 11, 2002. The IRS, however, did not file its first tax lien until April 2003. If CAC and MetalMax are a single entity, the bank's perfected security interest attached to CAC's accounts receivable at the time the work was performed for Mecco by MetalMax, which occurred no later than December 11, 2002. If this is the case, then the bank's security interest will take priority over the federal tax liens because its interest attached to the property and was "choate" well before the IRS filed notice of its tax liens.

> **B.    CAC and MetalMax Are A Single Entity Jointly Owned and Operated by Clifford Clarkson**

With the foregoing in mind, the IRS argues that CAC and MetalMax are two separate entities, with MetalMax operating as a separate sole proprietorship run by Clarkson. Under this reasoning, the IRS argues that the bank has no entitlement to the interpleader funds because

Mecco owes those monies to MetalMax, rather than CAC. Accordingly, the IRS asserts that the tax liens against Clarkson individually take priority over the bank's security interest in CAC's accounts receivable. For the reasons set forth below, I find that the facts do not support this argument, and conclude that CAC and MetalMax are a single company.

The Court has not been provided with any authority, nor has it been able to locate any through its own research, to support the proposition that an informal entity such as MetalMax, closely related to a formally incorporated entity such as CAC, should be treated as a sole proprietorship for the purpose of determining the competing interests of its creditors. The most analogous authority is found in those cases in which the court is asked to "pierce the corporate veil" by treating separate legal entities as one for the purpose of imposing liability on a parent for the actions of its subsidiary, or upon an individual for the actions of a corporation. In this context, the Maryland Court of Special Appeals observed:

> The corporate entity is disregarded ... wherein it is so organized and controlled, and its affairs are so conducted, as to make it merely an instrumentality, agency, conduit, or adjunction of another corporation.

*Dixon v. Process Corp.*, 38 Md.App. 644, 654 (Md.App. 1978). When determining whether two distinct corporate entities will be treated as one in the same, factors to be considered include:

> (1) the presence in both corporations of the same officers or directors; (2) common shareholders; (3) financial support of the subsidiary's operations by the parent; (4) underwriting the incorporation and purchase of all of the capital stock of the subsidiary by the parent corporation; (5) the fact that the subsidiary was organized with a grossly inadequate capital structure; (6) a joint accounting and payroll system; (7) the subsidiary lacks any substantial business contacts save the parent and operates solely with assets conveyed by the parent corporation; (8) in the financial statements of the parent, the subsidiary is referred to as a division of the parent corporation or obligations are assumed to be those of the parent; (9) the property of the subsidiary is used by the parent corporation as its own; (10) the individuals who exercise operating control over the subsidiary exercise it in the

>interest of the parent; and (11) failure to observe formal requirements in the operation of the subsidiary.

*Id*. (citing 7 A.L.R.3d 1343, 1355 (1966)).

I find that these factors are instructive in analyzing the facts of this case. First, Clarkson was the principal of both CAC and MetalMax and exercised control over both. The two entities would have had the same officer, director and shareholder but-for the fact that MetalMax was not formally organized, which, in my view, provides further evidence that it was part of CAC. Next, Clarkson kept one set of books for both and, even though the two technically had separate bank accounts, and treated their receivables as the same. Both were listed on Clarkson's only business license, and both were operated out of the same location. Although CAC and MetalMax had separate union contracts, all employee benefits were both paid and reported to one union fund. Moreover, CAC and MetalMax made combined certified payroll reports to the DOL on Davis-Bacon Act projects. There also was testimony that some employees worked for both CAC and MetalMax. Finally, and perhaps most significantly, CAC and MetalMax had only one federal tax identification number, filed only one set of federal tax returns, and issued Form W-2s to employees of both companies in the name of CAC.

Regardless of whether Clarkson held out CAC and MetalMax to be two separate companies, the evidence presented makes clear that they were a single operation, and the fact that CAC operated under the trade name MetalMax does not, in and of itself, mean that the two are separate entities. Under Maryland law, there is no requirement that a contracting company register a trade name, nor was the bank required to include the trade name on its financing statement. *See* Md. Code Ann. CORPS. & ASSOCS. § 1-406 (limiting the business that

must register a trade name with the SDAT to those engaged in "mercantile, trading, or manufacturing"); Md. Code Ann. COMM. LAW. § 9-503(b)(1)(a financing statement is not misleading if it does not include a trade name). Moreover, although there is no Maryland law directly on point, numerous other jurisdictions have held that operating under a trade name does not create a separate legal entity. *See, e.g.*, *Bauer v. Pounds*, 762 A.2d 499, 504 (Conn. App. Ct. 2000)(collecting cases). *See also* 6 Fletcher Cyc. Corps. § 2442.

Accordingly, I find that MetalMax operated as a division of CAC and that the two were one entity. For that reason, the bank's security interest in CAC's accounts receivable has priority over all monies that became due prior to the date that CAC forfeited its corporate charter.

### C.      The Forfeiture of CAC's Charter

Having determined that the bank's security interest has priority over the federal tax liens with regard to accounts receivable attributable to work performed before CAC forfeited its corporate charter, the next issue presented is what affect, if any, this forfeiture has on the priorities of the parties with respect to accounts receivable attributable to work performed after the forfeiture date. The IRS argues that, because CAC lost its legal status as a corporation under Maryland law when it forfeited its corporate charter on October 7, 2002, any accounts receivable acquired after that date belong to Clarkson as an individual. *See Kroop & Kurland v. Lambros*, 118 Md. App. 651, 657, 703 A.2d 1287 (1998)("When a corporation's charter is forfeited ... the corporation is dissolved by operation of law and ceases to exist as a legal entity")(citations omitted). Because the IRS has liens against Clarkson as an individual, whereas the bank's security interest is tied only to CAC, the tax liens would have priority over any funds due and

owing to Clarkson as an individual. The Court does not need to decide this issue, however, because the amount of the accounts receivable owed to CAC/MetalMax attributable to work performed before the forfeiture date is $238,354.90 - significantly higher than the $80,694.00 available in the original interpleader funds. The interpleader funds therefore will be exhausted by Colombo's security interest in CAC's accounts receivable and there is no need to determine which party has priority over the final $13,135.00 in accounts receivable resulting from work that was arguably performed after the forfeiture date.

   **D.**  **The bank's security interest has priority over the settlement funds**

Finally, the IRS claims that it has priority over the additional interpleader funds arising out of the settlement agreement between Colombo Bank, as a secured creditor of CAC Balancing, and Mecco, Inc. The IRS argues that the settlement funds did not come into existence until the settlement agreement was consummated on or about March 1, 2007, and therefore bank's security interest in CAC's accounts receivable did not attach or become "choate" until that date. Because the notice of the federal tax lien already had been filed at that time, the bank's security interest and the federal tax liens would have attached at the same time and the federal tax liens would have prevailed. I disagree with the result urged by the IRS.

As discussed above, the bank's security interest in CAC's accounts receivable attached and became "choate" at the time CAC/MetalMax performed the work for Mecco giving rise to those accounts. When CAC defaulted on its promissory notes, Colombo, under Maryland law, had the right to step into CAC's shoes and enforce the obligations of its account debtors. Md.

Code Ann. COMM. LAW § 9-607.[9]  The bank did just that when it filed its counterclaim against Mecco alleging that Mecco owed CAC more than the $80,694 in interpleader funds identified in the complaint.

To suggest that the bank's security interest in CAC's accounts receivable somehow became inchoate by virtue of its efforts to collect those accounts receivable would render meaningless the great weight of authority cited above that holds an account receivable to be perfected, for the purposes of federal tax law, when the work giving rise to the account receivable is performed. *See, e.g.*, 26 C.F.R. § 301.6323(c)-1. Under this reasoning, any lien against accounts receivable would be deemed "inchoate" by a dispute over the amount owed by the account debtor.

The fact that the additional interpleader funds resulted from the settlement of a lawsuit does not change this result.  Colombo's counterclaim was brought for the sole purpose of collecting the accounts receivable owed to CAC by Mecco. The resulting settlement funds are proceeds of those accounts receivable. *See* Md. Code Ann. COMM. LAW § 9-102(65)(defining proceeds as "whatever is collected on, or distributed account of, collateral"). Although the settlement funds themselves did not come into existence until after the tax liens were filed, the bank's security interest in the underlying accounts receivable existed, attached, and were choate

---

[9]CL § 9-607 states:

> If so agreed, and in any event after default, a secured party:
> ***
> (3) may enforce the obligations of an account debtor ... and exercise the rights of the debtor with respect to the obligation of the account debtor ... to make payment or otherwise render performance to the debtor.

for the purposes of the FTLA when CAC/MetalMax performed the work for Mecco giving rise to the accounts receivable. 26 U.S.C. § 6323(h). *Cf. PPG Industries, Inc. v. Hartford Fire Ins. Co., et al.*, 531 F.2d 58 (2d Cir. 1976)(discussing a bank's continued security interest in the proceeds of an insurance policy). When the accounts were "collected" by the settlement of the lawsuit the bank's security interest continued in their proceeds under Md. Code Ann. COMM. LAW § 9-315(a)("A security interest attaches to any identifiable proceeds of collateral"). In an analogous case involving the proceeds from an insurance policy, the United States Court of Appeals for the Second Circuit held that a bank's security interest took priority over a federal tax lien with regard to the proceeds of an insurance policy the bank had required the debtor to purchase as a term of its security agreement. *PPG Industries, Inc.*, 531 F.2d 58. In that case, the bank held a security interest in the underlying collateral - the insurance policy. The court held that the proceeds of the policy were "merely the collateral in another form," and that the priority from the bank's security interest in the underlying collateral continued in those proceeds. The court observed that, "[a]ny contrary result would penalize the very party responsible for the existence of this fund in the first place." *Id*. at 62. A contrary result in this case likewise would penalize the bank, the very party responsible for the existence of the settlement funds.

The IRS has cited several cases holding that a security interest does not attach to settlement funds until those funds are realized. Those cases are distinguishable because, even though they discuss the priority of tax liens over negotiated settlements, the underlying security interests are distinguishable from the bank's interest in the present case. For example, *United States v. McDermott*, 507 U.S. 447 (1993), addressed a judgment lien rather than a security interest in an account receivable. The creditor bank admitted that its judgment lien did not attach

16

to the real property at issue until the debtor acquired the property, which occurred after the tax liens had been filed. *Id*. at 452. The *McDermott* Court distinguished the judgment lien at issue from commercial financing transactions agreements exempted by § 6323(c), noting:

> that provision [§ 6323(c)(1)] protects certain security interests that, like the after-acquired-property judgment lien here, will have been recorded before the filing of the tax lien, and will attach to the encumbered property after the filing of the tax lien, and simultaneously with the attachment of the tax lien. According special priority to certain state security interests [ie. commercial financing transactions] ... presumes that otherwise the federal tax lien would prevail.

*Id*. at 453-454.

Likewise, *United States v. Pioneer Insurance Co.*, 374 U.S. 84 (1963), addressed the competition between tax liens and a lien for attorneys' fees arising from a mortgage deed of trust. The Court held that, because the attorneys' fees had not been *incurred* and their amount not finally fixed until after the federal liens had been filed, the lien for attorneys' fees was inchoate and the federal liens took priority. *Id*. at 87 (emphasis added). Significantly, the Court observed:

> there is no showing in this record that the mortgagee *had become obligated to pay* and had paid any sum of money for services performed prior to the filing of the federal tax lien.

*Id*. at 91 (emphasis added). By contrast, in this case Mecco became obligated to pay CAC/MetalMax for work performed well *before* the federal tax liens were filed.

In *V.J. Processors, Inc. v. Fireman's Fund Ins. Co's*., 679 F.Supp. 399 (D.Vt. 1987), V.J. Processors brought an action against Fireman's seeking proceeds from a liability and indemnity policy. Prior to judgment, V.J. assigned $22,500 of the proceeds of that judgment to a third party. The Court held that the third party did not hold a legally enforceable lien until after the judgment was entered because prior to that time there was no property subject to the lien. Accordingly, the third party's lien attached at the same time as the tax lien at issue, which took priority. *Id*. at 401.

The present case is distinguishable from *V.J. Processors* because CAC/ MetalMax and the bank, through its perfected security interest, had rights in CAC's accounts receivable at the time the work was performed.

In *Fleet Bank, N.A. v. Coffin*, 1992 WL 81984 (D.Conn. 1992), the plaintiff bank held a security interest in the proceeds of trust litigation initiated by Coffin. The Court found that the bank's security interest did not have priority over the federal tax liens in that case because the *proceeds* were not realized until the settlement of the lawsuit. In contrast, the IRS's tax liens had attached to Coffin's cause of action, giving them priority over its proceeds. The Court explained that, *if the bank had a security interest in Coffin's underlying cause of action*, it would have had priority over the settlement proceeds. *Id*. at *6. Again, here, Colombo had a security interest in the underlying accounts receivable, therefore its interest continued into the settlement of those accounts.

Finally, *Gaeta v. United States*, 1982 WL 1668 (W.D.N.Y. 1982), involved liens competing for priority in the settlement resulting from a negligence action. The Court held that any liens on those funds did not become choate until the parties agreed on the settlement amount, and, because the competing interests became attached at the same time, the tax liens took priority. Notably, the court did not indicate what type of collateral secured the competing lien created under state law. In contrast, CAC's right to payment from Mecco was never contingent, and the fact that the Bank decided to accept a lesser amount for Mecco's work does not change that fact.

At trial, the IRS argued that the bank's lien against the settlement funds was inchoate because the settlement agreement between Colombo and Mecco purported to settle,

> any and all claims or causes of action known or unknown, connected to or arising out of the Litigation.

Indeed, in *National Communications Association, Inc. v. National Telecommunications Association, Inc*., 1995 WL 236731 (S.D.N.Y. 1995), an unreported case cited by neither party, the court held that a security interest in accounts receivable could not be deemed to be choate with regard to settlement funds that "were not specifically earmarked" as the settlement of a claim for accounts receivable. *Id*. at *22.  In this case, however, I find that the term "Litigation" used in the settlement agreement refers specifically the settlement of the interpleader action and the bank's corresponding counterclaim, which was limited to a claim for unpaid labor and materials. The settlement funds therefore are sufficiently earmarked as a resolution of the claim for unpaid accounts receivable, and therefore are subject to the bank's perfected security interest. Any contrary result would favor form above substance.

**IV     Conclusion**

For the foregoing reasons, I find that the bank's security interest in CAC's accounts receivable has priority over the entire $157,500 in interpleader funds. A separate order has previously issued directing the Clerk of the Court to disperse those funds to Colombo Bank consistent with this opinion.

Signed May 16, 2007                                             /S/
                                                        Paul W. Grimm
                                                  United States Magistrate Judge